

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES:LKG/AS
F#: 2020R00291

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 18, 2020

<u>By ECF and Email</u>

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Chierchio, <u>et al.</u>
> <u>Criminal Docket No. 20-306 (NGG)</u>

Dear Judge Bloom:

The government respectfully submits this letter requesting that the Court enter permanent orders of detention against defendants Frangesco ("Frankie") Russo and Francis ("Frank") Smookler.  It also asks that the Court detain defendants Christopher Chierchio and Jason ("Jay") Kurland, unless they submit significant bail packages secured by property and financially responsible sureties.  The charges against all four defendants are serious, the evidence against them is overwhelming and each faces significant sentences if convicted.  Russo and Smookler also present an unacceptable danger to the community, and for that reason they should not be released.

The indictment charges two schemes.  *First*, Kurland, Chierchio, Russo and Smookler are charged with conspiring to commit and committing money laundering and wire fraud offenses (including, for Kurland, honest services fraud), all stemming from the scheme by the defendants, together with others, to defraud Kurland's clients.  Kurland is an attorney specializing in representing lottery winners, purporting to help them make sound investments. He abused his clients' trust by encouraging them to make large investments in entities run by Chierchio (a soldier in the Genovese crime family), Smookler (a former securities broker) and Russo, who, in turn, siphoned money from his clients' investments for themselves, and paid Kurland kickbacks for steering his clients to them.  Kurland failed to disclose to his clients either the kickbacks or his relationship with the entities.  On one occasion, Kurland simply transferred $19.5 million out of one of his clients' accounts without permission, much of which was ultimately funneled to Chierchio.  In total, as a result of the scheme, Kurland's clients lost more than $80 million.  All four defendants, however, profited handsomely, fueling lavish lifestyles

that included flying private jets, taking exotic vacations, buying boats, paying country club dues and even "wrapping" luxury cars.

*Second*, Russo and Smookler are also charged with committing and conspiring to commit extortionate extension of credit and extortionate collection of credit, for threatening to torture, shoot and kill an individual and his family, because that person could not timely repay a usurious loan they had extended him. Although this individual had also lost some of Kurland's clients' money, Russo and Smookler told him to pay back their loan first. Both the threats and the terms of the loan are captured on audio recordings.

I.      Background

        A.      The Defendants

                1.      Jason Kurland, the "Lottery Lawyer"

        Kurland has been a practicing attorney for 20 years and is a partner at the law firm Rivkin Radler LLP. He has branded himself the "Lottery Lawyer," reserving both the website "Thelotterylawyer.com" and the @lotterylawyer Twitter handle. By one recent estimate, his clients—scattered across the nation—have won a combined $3 billion.[1] In his pitch to clients, Kurland offers trust, transparency and sophisticated financial advice to minimize risk. He has promoted those qualities in interviews, stating in one that it is important for lottery winners to "know[] that someone can walk you through it, step by step, so there are no surprises. . . ."[2] He added that, "The biggest mistake people make is doing it on their own."[3] Kurland's "exclamation point" to his law practice, as another article put it, is the work he has done for a lottery client who won $1.5 billion;[4] that client is identified as "Lottery Victim 3" in the indictment. In the article, Kurland stated that he was retained because Lottery Victim 3 was convinced that Kurland could be trusted.[5]

        Kurland's clients rely on him to safeguard their winnings and provide sound investment advice. The victims identified in the indictment (the "Lottery Victims") requested that Kurland invest their money in "secure" investments. For his services, Kurland and his law firm obtained from the Lottery Victims an upfront payment of between $75,000 and $200,000,

---

[1]     Andrew McIntyre, For Lawyer, Chance Powerball Job Leads To New Career Path, Law 360 (Aug. 23, 2019, 12:25 PM EDT), https://www.law360.com/articles/1190478/for-lawyer-chance-powerball-job-leads-to-new-career-path.

[2]     Susan DeSantis, How a $254M Powerball Ticket Changed This Lawyer's Life, Law.com (Mar. 19, 2019 at 01:59 PM), https://www.law.com/2019/03/19/how-a-254m-powerball-ticket-changed-this-mans-life-292-42192.

[3]     Id.

[4]     McIntyre, supra note 1.

[5]     Id.

and additional monthly fees of between $15,000 and $50,000. Kurland led the Lottery Victims to believe that this money—totaling millions of dollars in compensation—was the only fee Kurland received from them. As detailed below, Kurland lied to the Lottery Victims.

### 2.    Kurland's Co-Conspirators

Kurland's co-conspirators in the scheme to defraud his clients included, among others, co-defendants Chierchio, Smookler and Russo. Chierchio is a soldier in the Genovese crime family of La Cosa Nostra and controls an entity called Chrch Group. As detailed below, Chrch Group received $1.4 million from one Lottery Victim and at least $15.5 million from another. Chierchio has not returned any of the money he received from these victims, but has continued to spend tens of thousands of dollars monthly to support his lavish lifestyle.

Russo and Smookler are Kurland's close associates and control many entities that participated in defrauding the Lottery Victims. The co-conspirators used these entities to make some investments—most of which resulted in staggering losses—but also used them to engage in money laundering and fraud. As recounted in more detail below, Russo and Smookler invested some of the Lottery Victims' money with Gregory Altieri, who lost much of it and whom they later extorted to collect a separate "street loan."

### B.    Scheme to Defraud the Lottery Victims

The defendants' scheme was simple.[6] Kurland began by primarily presenting the Lottery Victims with traditional investment options from large and well-known institutions. After the Lottery Victims grew comfortable with Kurland's advice, Kurland returned to the Lottery Victims with different investment opportunities, in entities that extended high-interest loans to small businesses, also known as "Merchant Cash Advances" and, during the COVID-19 pandemic, a company that sold Personal Protection Equipment ("PPE") to the state of California. Kurland falsely told the Lottery Victims that all of these investments came on his radar simply because they were promising opportunities, and failed to tell the Lottery Victims that investment "managers" Russo and Smookler were his close associates; that in some cases, he was affiliated with the entities as a part owner; that he would receive substantial kickbacks if the Lottery Victims agreed invest in those entities; and that Chierchio, Russo, Smookler and others planned to siphon money from the investments for themselves. Each of the Lottery Victims followed Kurland's recommendations for these non-traditional investments, collectively investing about $107 million in the businesses managed by the co-conspirators, at least $19.5 million of which was taken from one of the victims without his/her knowledge. As a result of these investments, Kurland pocketed hundreds of thousands of dollars in undisclosed kickbacks; the other defendants stole far more money directly from the investments. In all, of the $107 million that was invested by the Lottery Victims with the defendants' entities, over $80 million was either stolen or lost.

---

[6]    The indictment and summary of the evidence in this letter are based on the defendants' conduct as it relates to the Lottery Victims, and the government is continuing to

Kurland also knew that failing to disclose his affiliation with the sham entities, his association with his co-conspirators and the kickbacks he received was deeply wrong: "I'm not a stockbroker. I'm—that's not what I'm supposed to be doing." [7] But Kurland did it anyway. One person who spoke with Kurland summarized Kurland's view of his clients—that lottery winners "just don't understand how much money they actually have . . . [,] so . . . right away they're a little bit, you know, cheap." With the initial, legitimate investments out of the way, Kurland steered his clients to his and his co-conspirators' entities, and they all secretly lined their pockets. At one point, they simply took almost $20 million from Lottery Victim 3 without Lottery Victim 3's knowledge.

The facts summarized below are derived from interviews with the Lottery Victims (who spoke to the FBI voluntarily), bank records and months of intercepted communications authorized by four judges in the Eastern and Southern Districts of New York. These communications captured Chierchio, Kurland, Russo and Smookler admitting to their crimes and discussing ways to obstruct the investigation. In the intercepted communications quoted below, the co-conspirators referred to Lottery Victim 1 (the winner of a $245 million Powerball jackpot) as the "Staten Island people," Lottery Victim 2 (the winner of a $150 million jackpot) as "Healthy Rainbow," and Lottery Victim 3 (the winner of the $1.5 billion Mega Millions lottery) as "South Carolina."

      1.    <u>Lottery Victim 1—"Staten Island people"</u>

Lottery Victim 1, a Staten Island resident, signed a retainer with Kurland in September 2018 for an $100,000 up-front fee and a $15,000 monthly fee. Kurland initially advised Lottery Victim 1 to invest in traditional investment funds, as well as in Cheddar Capital, a company that purportedly lends money to small businesses. Kurland then persuaded Lottery Victim 1 to invest more money in Cheddar Capital, as well as in entities called Francis Bay and JBMML. Ultimately, Lottery Victim 1 agreed to invest $10 million in Cheddar Capital (in two separate installments of $5 million each), $2 million in Francis Bay and $5 million in JBMML.

---

investigate whether additional victims were defrauded by the defendants. To the extent any of the evidence summarized above comes from the Lottery Victims' statements to the Federal Bureau of Investigation ("FBI"), they are only brief summaries, relayed here in sum and in part to give the Court some insight into the defendants' conduct.

      [7]    All the recorded conversations quoted in this letter are prepared in draft form only. The government will prepare a finalized version of the transcripts in advance of trial. The government also hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case. In order to preserve the integrity and confidentiality of the government's investigation, notice of some of the defendants of the wiretap interceptions prior to their arrest was not feasible. This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

a)  October 1, 2018 and January 2, 2019 Transfers Totaling $10
Million to Cheddar Capital (Counts Eight & Ten)

On October 1, 2018,[8] Lottery Victim 1 transferred $5 million to Cheddar Capital. Lottery Victim 1 made the investment after Kurland introduced him/her to Cheddar Capital's Chief Executive Officer.  Kurland vouched for this person, and Lottery Victim 1 trusted Kurland completely.  Lottery Victim 1 made a second transfer of $5 million to Cheddar Capital on January 2, 2019, for a total investment in that entity of $10 million.

Kurland neglected to tell Lottery Victim that Kurland himself had a 20% stake in Cheddar Capital, and that it was also controlled by Kurland's close associates, Russo and Smookler.   Nor did Kurland disclose to Lottery Victim 1 that Kurland would receive a substantial kickback as a result of steering Lottery Victim 1 to invest in Cheddar Capital. Specifically, within two days of receiving the October 1, 2018 $5 million transfer from Lottery Victim 1, Cheddar Capital sent two wires totaling $63,000 to an entity called GK3 LLC ("GK3") that was owned by Kurland.[9]  Kurland subsequently transferred that money from GK3 to a personal account, from which he paid taxes and his own expenses.  Similarly, Cheddar Capital sent GK3 $63,000 on the same day as the January 2, 2019 $5 million transfer, plus another $13,500 two weeks later.  Kurland then paid $20,000 to "Classic Vacations" and transferred additional money to his personal account, from which he paid over $4,000 to Classic Vacations and from which he sent $85,000 to the IRS.

---

[8]      The dates set forth in this letter are all approximate.

[9]      Unless otherwise specified, when this letter refers to Kurland's initial receipt of funds, it is a reference to the transfer of funds into Kurland's GK3 entity.  Like his co-defendants, Kurland used an entity to routinely launder proceeds of the fraud scheme; those co-defendants have stated on multiple intercepted conversations that use of such entities was necessary to make it difficult for law enforcement to trace the criminal proceeds of the scheme. On one call, Russo explained to Smookler that he did not want money sitting in one account, stating that they needed to "move it around," and adding that the money had to be moved around "ASAP, I don't like to keep it where it lands."  Smookler then discussed which accounts the FBI might subpoena.  Bank records show these were not just words.  For instance, on January 7, 2019, GK3 sent JBMML $31,250, and just ten days later, JBMML returned the same amount to GK3.  As another example, on October 18, 2018, shortly after Kurland received approximately $359,000 from Francis Bay, he transferred $300,000 back to another account associated with Russo and Smookler, followed by another transfer of $25,000.  Likewise, on February 19, 2019, Kurland transferred $40,000 to Russo and Smookler, and six days later Russo and Smookler transferred it back.

b)      October 17, 2018 Transfer of $2 Million to
        Francis Bay (Count Nine)

On October 17, 2018, Lottery Victim 1 transferred $2 million to Francis Bay for an investment.  Subsequently, Francis Bay sent about $35,000 as a kickback to Kurland at GK3,[10] which Kurland again forwarded on to his personal account and used for personal expenses.  Kurland's co-conspirators also directly stole money that Lottery Victim 1 had invested in Francis Bay.  For example, on the same day that Francis Bay received Lottery Victim 1's investment, Russo made two withdrawals from the entity totaling approximately $150,000. In addition, Russo made payments from Francis Bay (by way of one of his other entities, Meeker World Management Inc. ("Meeker")) to cover his personal expenses, including $20,000 for taxes and over $10,000 to American Express.

By April 2019, Francis Bay had virtually no money left in its account and it closed.  Indeed, it appears that the co-conspirators used the account primarily to receive Lottery Victim 1's money, which constituted the vast majority of the money that came into Francis Bay.[11]

c)      April 12, 2019 Transfer of $5 Million to JBMML (Counts Three
        and Fourteen)

On April 12, 2019, Lottery Victim 1 made a $5 million investment to JBMML, which, as noted below, was the same day that Kurland had Lottery Victim 3 send $12.6 million to JBMML.   The co-conspirators subsequently used a portion of the Lottery Victims' money as their personal slush fund, making payments directly from JBMML to cover expenses and transferring money from JBMML to their personal accounts.  For example, on the date that the two transfers were received from the Lottery Victims, JBMML issued a $2,100.50 check to Porsche, with the memo line "Jays Car" (i.e., Kurland's car); additional payments were made from JBMML by check approximately two weeks later, including $13,475 to "Franks Range Rover" for Smookler's Range Rover, and $17,200 for a watch for one of the co-conspirators ("CC-2").  Similarly, following the transfers from the Lottery Victims, the co-conspirators directed a series of wires from JBMML:  $250,000 to Smookler's personal account, $250,000 to Russo's personal account and $66,294 to American Express.  They also transferred over a million dollars to Smookler's and Russo's various entities, at least some of which went towards personal expenses, including, for example, Smookler's $23,400 payment to VIP Auto towards a 2019 Bentley, $5,643 in purchases at Dick's Sporting Goods, and thousands more in cash withdrawals and personal expenses.

---

[10]     Kurland initially received $359,000 but following additional transfers—again reinforcing the money laundering charges—kept only approximately $35,000.

[11]     This was true of most of Russo's and Smookler's entities: the majority of the money came from the Lottery Victims.

Kurland also received a kickback for directing Lottery Victim 1 and Lottery Victim 3 to invest in JBMML, which he did not disclose to either Lottery Victim 1 or Lottery Victim 3. Specifically, days after the Lottery Victims transferred a total of $17.6 million to JBMML, JBMML sent Kurland $176,000, his customary 1% kickback. Kurland then transferred that money from GK3 to his personal account and used it to, among other things, pay almost $30,000 for a golf club membership, and to go on shopping sprees, spending over $10,000 at Saks Fifth Avenue, Fendi and Hirshleifers, a high-end luxury store.

As of August 14, 2020, JBMML's account had only $40,588, despite the fact that the Lottery Victims had invested more than $42 million in JBMML.

### d)    The Defendants' Conversations About Lottery Victim 1

In approximately 2019, Kurland advised Lottery Victim 1 to retain separate counsel ("Lottery Victim 1's Counsel") to field inquiries from the United States Securities and Exchange Commission (the "SEC"). Based on intercepted communications, Lottery Victim 1's Counsel appears to have been recommended to Kurland by Smookler's counsel ("Attorney 1").

Until recently, Lottery Victim 1 placed complete trust in Kurland and did not request an update on the status of his/her investments in Cheddar Capital, Francis Bay and JBMML. This was because Lottery Victim 1 believed that Kurland—who he/she thought had no affiliation or interest in those entities—would protect his/her interests. But when Lottery Victim 1's Counsel began requesting records from Kurland in connection with Lottery Victim 1's investments, intercepted calls show that Kurland became concerned. Those calls also show that Kurland and the other co-conspirators maligned Attorney 1 for suggesting that Lottery Victim 1 should have separate counsel to communicate with the SEC, and talked about how they could determine whether the requests by Lottery Victim 1's Counsel were driven by the government.

For example, during one intercepted call in May 2020, Kurland told Smookler, "Why don't you call [Attorney 1] on behalf of JBMML and say you heard . . . they [i.e., law enforcement] contacted him." Kurland added, "don't forget, he [Attorney 1] gave me his best friend [Lottery Victim 1's Counsel] to represent my client [Lottery Victim 1]. Like his best friend, that's what he said."[12] Smookler responded, "Right, so I am sure that he [Lottery Victim 1's Counsel] is doing the right thing," i.e., not actually protecting Lottery Victim 1's interest but instead protecting the co-conspirators. Kurland responded, "You would think so," and then explained how the co-conspirators should figure out why Lottery Victim 1 wanted to see the records of his investments, whether Lottery Victim 1 was "working with them [i.e., the FBI]" or whether Lottery Victim 1's Counsel was just "getting in my client's head." On a subsequent call with Smookler, Kurland stated explicitly, "We gotta know if he was contacted or at least talking to them, you know?"

---

[12]    The government is aware that Attorney 1 has represented Smookler and the government has, since the beginning of the interception period, automatically and fully minimized all communications in which Attorney 1 was a party. Communications between Russo and his counsel have also been fully minimized.

That same month, on a call that included Kurland, Smookler and Russo, the co-conspirators discussed their potential criminal exposure.  Smookler stated that he hoped the Lottery Victims would tell the FBI, "Listen, I don't give a shit, leave me alone, I gave Jay [Kurland] money—I gave him *all* my money, and I don't even give a shit, just leave me alone," and if they do that, Smookler continued, "then they [i.e., the FBI agents] don't have a case." Kurland responded that he would like to tell Attorney 1 "to tell his friend [i.e., Lottery Victim 1's Counsel] to act like that."

A month later, on a June 2020 call, as Kurland updated Smookler on the Lottery Victims, Smookler wondered if the Lottery Victims could refuse to cooperate with the FBI and thus impede any investigation: "[D]o you think ultimately they are going to look and the clients are going to say 'Jay [Kurland] is my guy and everything's fine, leave me alone?'"  Kurland stated he thought that was realistic but Lottery Victim 1's Counsel was getting in the way: "That's where we are right now, but I am gonna be honest, I think that [Attorney 1]'s best friend, I think is stirring the pot."

2.      Lottery Victim 2—"Healthy Rainbow"

The defendants perpetrated the fraud on Lottery Victim 2 in much the same way as Lottery Victim 1.  Lottery Victim 2 agreed to pay Kurland and his firm $75,000 up front and another $15,000 monthly.  Lottery Victim 2 requested that Kurland recommend conservative investments.  Kurland initially recommended to Lottery Victim 2 investments in mainstream financial institutions but soon returned with other "opportunities," that is, investments in entities that unbeknownst to Lottery Victim 2 were run by Kurland's business partners.

a)      October 31, 2019 $5 Million Transfer to JBMML (Counts Five and Fifteen)

On October 31, 2019, on Kurland's advice, Lottery Victim 2 transferred $5 million to JBMML for a purported opportunity to invest in a money-lending entity.  Kurland falsely represented to Lottery Victim 2 that JBMML was connected to the Diamond District in Manhattan and was, according to him, a very safe investment that would yield Lottery Victim 2 approximately $48,000 in monthly interest payments.  Kurland was apparently referring to JBMML's intention to invest with Gregory Altieri, who was running a business from his home in the New York suburbs that bought and sold jewelry, which Altieri told investors could produce returns as high as 70% in months.  In reality, Altieri's jewelry business was a $200-million Ponzi scheme.  See United States v. Altieri, 20-CR-249 (BMC).

After Lottery Victim 2 invested in JBMML, the co-conspirators siphoned off a portion of that investment for themselves.  Some of the stolen funds were used in their own Ponzi-like scheme to keep the Lottery Victims from realizing that their "investments" were not successful.  Specifically, the day after Lottery Victim 2's investment in JBMML, on November 1, 2019, the co-conspirators funneled part of Lottery Victim 2's $5 million investment back to Lottery Victims 1 and 3.  Kurland represented to Lottery Victims 1 and 3 that this money constituted interest payments on their own investments.

The co-conspirators also used money stolen from Lottery Victim 2's investment in JBMML for personal expenses, including thousands of dollars in payments to Porsche for Kurland's car, over $260,000 in American Express payments for Russo and Smookler, over $100,000 in payoffs to various individuals associated with the co-conspirators and thousands of dollars more in cash withdrawals after the money was filtered through yet another entity. These payments were again used to fund the co-conspirators' lavish lifestyle; for example, the November American Express payments that were made using Lottery Victim 2's JBMML investment included thousands of dollars spent for, among other things, steakhouse meals, a night at a resort, a private helicopter, and a $134,000 boat for Smookler. Russo also used over $1.5 million from Lottery Victim 2's investment to purchase a home on Motts Cove Drive in Roslyn, New York (the "Motts Cove house"), which Russo was scheduled to move into later this month and is one of the three properties on which the government placed a lien. Bank records related to later investments from Lottery Victims 2 and 3 show additional expenses paid towards the Motts Cove house out of those investments, including $300,000 to an interior design firm.

In addition, six days after Lottery Victim 2's investment, Kurland received a kickback of $50,000 from JBMML. Kurland never disclosed this kickback to Lottery Victim 2. As noted above, there is virtually no money left in JBMML.

> b)   April 29, 2020 Transfer of $2.5 Million to Azimut 43 LLC (Count Seven)

Kurland also persuaded Lottery Victim 2 to make a $2.5 million investment in a company called "PPE Platinum LLC" ("PPE Platinum"), which allegedly invested in PPE that was sold to the state of California. An entity called Azimut 43 LLC ("Azimut") was represented as the borrower of the $2.5 million note.[13] Kurland told Lottery Victim 2 that he/she would receive the entire principal back by July 16, 2020, on top of up to $1.25 million in profit. Lottery Victim 2 signed an agreement with Smookler (on behalf of another entity, called Southbound) and a co-conspirator ("CC-1"), which explicitly stated that PPE Platinum would not distribute any money to its members until Lottery Victim 2's $2.5 million note was repaid. On April 29, 2020, Lottery Victim 2 transferred $2.5 million to Azimut.

Despite the agreement and Kurland's representation, the day after the transfer, Smookler (through his entity called Gold Standard Depository) and Russo (through Meeker), as well as the daughter of CC-1, received $10,000 each from Lottery Victim 2's investment in Azimut. Subsequently, on May 1, 2020, "Chrch Group," the entity controlled by Chierchio, received $1.4 million.

---

[13]   Notably, Azimut is the same entity that received the stolen $19.5 million from Lottery Victim 3, discussed below. Kurland did not disclose to Lottery Victim 2 that Azimut, an entity supposedly specializing in PPE deals, was actually a "boat management company." On a recorded call in July 2020, an assistant working with Russo and Smookler (the "Assistant") told Smookler and CC-2 that a bank had been calling asking about the nature of the company and the Lottery Victims' contact information. The Assistant recounted to Smookler that she had informed the bank this entity was indeed a boat management company but had been "sold" and

The co-conspirators used some of Lottery Victim 2's $2.5 investment in Azimut in a PPE deal with the New York City Police Department ("NYPD").  On May 20, 2020, the NYPD transferred $1.715 million to an account associated with a law firm used by CC-1.   By the following day, Smookler and Russo, through the same entities, took $110,000 each; CC-1's daughter received $307,500, to go along with the $10,000 she had received on April 30, 2020, and Kurland took $100,000, though as noted below, he returned it when the FBI interviewed Lottery Victim 2.

As of August 14, 2020, Azimut had $33,823 remaining, despite having received about $22 million from the Lottery Victims.

### c)      The Defendants' Conversations About Lottery Victim 2

The FBI interviewed Lottery Victim 2 on May 29, 2020.  Lottery Victim 2 told Kurland about the interview, and Kurland, Smookler and Russo immediately convened a conference call.  Kurland freely repeated his conversations with his client to the co-conspirators. Smookler relayed to Russo the problem—"this guy Minsky [i.e., FBI Special Agent Craig Minsky]" interviewed the "chick who gave us the two and a half million for Azimut."  Kurland then told his co-conspirators to return the money they took from Lottery Victim 2, as he put it, "claw[] back" any "ah, finder's fee, yeah, maybe that should all go back into, into the account, right, just say it was inadvertently sent, and put it back in there."  Later in the call, Kurland asked that Smookler and Russo send Kurland wire instructions that state that the $100,000 Kurland received "was inadvertently sent to you through, I don't know," to explain why Kurland was returning it—for a reason other than the fact that the FBI had interviewed Lottery Victim 2. Two days later, beginning on June 1 and on June 2, 2020, Kurland sent back to Azimut his own share of the money he pocketed, $100,000, in two installments.

This was not the only time that Kurland instructed the co-conspirators how to cover their tracks for the fraud they committed.  On a June 2020 call, Kurland told Smookler that it would not be enough simply to pay back the money to Lottery Victim 2, and that Smookler should think about the way the money was routed to make it appear as if the repayment was the product of a legitimate investment.  As Kurland warned, referring to the FBI, "It's going to be traced":

> [Y]ou gotta have PPE Platinum, as a real company, as a company
> that does business, and then show that you are going to give them
> the profits because they were induced to give the money based on
> that. . . . [U]se PPE Platinum, you know, as, as, as a company

---

was now being used for PPE-related deals; she also asked Smookler what to do about the Lottery Victims' contact information.  Smookler wondered if they could simply decline to provide it but settled on giving the bank Kurland's information instead.  Smookler then rationalized to the Assistant that they did take some money from the Lottery Victims "but it wasn't egregious money, you know, it was normal monies within the scope of the size of the monies we were dealing with, but the bulk of the monies went exactly where it was supposed to go."

> that's gonna do some stuff [] [b]ecause that's how it was induced.
> That word induced, it's like you know . . . important.

Kurland reinforced that message to Russo on a separate call, relaying what he had told Smookler: "[E]verybody can trace everything. . . . [A]ny money . . . around, NYPD, or whatever, you really should—you're playing with fire." Russo did not disagree but thought they could claim ignorance: "[I]f they really throw the book at us, they'll see the text messages and everything, they'll see all, they'll, they'll see that no, yes, what you're saying is accurate, but it's not like everybody did it maliciously."

On a July 2020 call, after Russo acknowledged that perhaps they should at least partly repay Lottery Victim 2, Kurland reminded Russo that the co-conspirators would have to make it seem like they were abiding by the agreement that promised Lottery Victim 2 the return of his/her entire $2.5 million investment, before any other party took money, as well as a percentage of the profits: "don't forget the way it's structured . . . with them [Lottery Victim 2] getting a percentage of distributions kind of thing, at the end, after the 2.5, you know they [Lottery Victim 2] haven't said it, but, you know they're—they have the right to ask for an accounting." In other words, Kurland, who was supposed to be protecting Lottery Victim 2's interests, openly expressed his hope that his client would not ask for "accounting" from the supposedly independent entity in which Kurland persuaded him/her to invest.

In early July 2020, the co-conspirators expressed that they were counting on Chierchio to repay some of the $2.5 million, since after Lottery Victim 2 made the $2.5 million investment in Azimut, Chierchio had received over half of that sum. When Kurland asked, "What about the rest of the 2.5? I'm nervous about that," Smookler responded that the money would be "coming from Chris [i.e., Chierchio]." Later that month, Kurland asked in another call with Smookler, "Where did that money go? Did he lose that million four? Like where did it go?" Smookler responded, "I don't know, I guess he said he was buying shit." Later that month, Russo and Smookler discussed needing to "push" Chierchio to pay something towards the $2.5 million principal, to, as Russo put it, "knock off a chunk so you feel a little better about it." But Chierchio refused to transfer any money, even though bank records show he was, at the same time, freely spending on items such as four private jet flights that cost approximately $90,000. As noted below, Chierchio never had any intention to repay the Lottery Victims. But, on June 29, 2020, in an effort to placate Russo and Smookler, Chierchio sent $1 million to an entity they controlled called Sirenusa G LLC ("Sirenusa").

On July 15, 2020, having failed to return any of Lottery Victim 2's money, Smookler and Russo again debated whether it would help thwart the ongoing FBI investigation if they paid Lottery Victim 2 something towards the $2.5 million principal. Russo thought sending anything short of $2.5 million would not "show any sign of good faith or anything . . . Cause they [i.e., the FBI] are gonna look and see, ok, well, look at this, look at that. And they'll look at the bank records. No way. They'll see people on jets, this that. And if you think they care that you paid back 30% of something while flying on jets, and this and that, they'll make it into this big thing." Smookler disagreed: "I mean this is $2.5 million bucks, we have the ability to pay them back, we should pay them back and get it off of our plate."

But despite the ability to pay Lottery Victim 2 the entire principal (to say nothing of his promised profits on his investment), the co-conspirators decided to only pay him a fraction. On a recorded call, Smookler directed the Assistant to send $250,000 to "Jay's Healthy Rainbow people" from their Azimut account. In a follow-up call, Kurland confirmed that Smookler and Russo sent the "250 . . . wire . . . to my guys," and then asked that Chierchio send a bit more because, he explained, even if they could wire just $100,000, an amount that would be "insulting" given how much the co-conspirators owed Lottery Victim 2, "anything will help" to appease Lottery Victim 2 as the FBI continued to interview him/her.[14]

When the FBI contacted Lottery Victim 2 again, on July 20, 2020, the co-conspirators regrouped. Kurland updated the co-conspirators on the conversation that Lottery Victim 2 had with the FBI, telling Smookler that Lottery Victim 2 reported more money was coming to him/her. Kurland said his client drew comfort from knowing "they [i.e., the people with whom Lottery Victim 2 believed he/she contracted for the PPE deal] are not taking anything until, you know, my 2.5 is paid back." Smookler, knowing the co-conspirators had twice siphoned off the money without fully repaying the victim, responded, "Mmmhmm." Kurland noted that since the FBI had focused on this $2.5 million, "I would just, if you guys took anything, I would implore you [to return it] for your own good." Smookler responded, "Yep."

The following day, Kurland again asked his co-conspirators to put back the money they had taken from Lottery Victim 2, just as he had when the FBI interviewed Lottery Victim 2: "[T]he NYPD shit . . . [,] you got to put that back in here, you're crazy not to." Referring to the contract they had signed with Lottery Victim 2, Kurland noted to Smookler and Russo: "[Y]ou got to live up to the docs, I mean that's what you signed for." He explained how the FBI would review the bank records and see where Lottery Victim 2's money had gone, and that the tens of thousands of dollars they stole from this particular transaction—a paltry sum for them—was not worth it: "[T]hey're gonna follow the trail . . . . You're absolutely fucking nuts not to give every single dollar of that to [Lottery Victim 2]. Crazy, like that's what you're gonna go down for? That?" Russo responded simply that he was "not going down for anything." Kurland also referred to CC-1, who signed the agreement with Lottery Victim 2 on behalf of his company and whose daughter received some of the money: "He's going to go to jail over this, that's what he wants to do?"

But instead of returning the money, that same day, Russo walked the Assistant through the past transactions, directing her to make the theft from Lottery Victim 2 appear as legitimate business transactions. During the course of that recorded conversation, the Assistant asked how they could possibly justify the thousands of dollars that had gone to CC-1 daughter's account: "What do you want me to do about [the daughter of CC-1], what do you want—do you want me to say the purpose for her?" Russo settled on labeling that transfer as a "commission pay out." The Assistant asked Russo if he was sure he was "okay with me putting commission?"; Russo confirmed that he was. As for the daughter's occupation, Russo said, "I don't know, put manager, put manager." And when the Assistant asked how to label the $100,000 return of funds (i.e., the kickback that Kurland returned after Lottery Victim 2 was

---

[14]   Lottery Victim 2 has still not been fully repaid for the principal, though he/she may have recently received some additional payments.

interviewed by the FBI), Russo explained that Kurland "deemed [it] as a mistake and it was ah, it was sent back."

Even as late as July 24, 2020, after the co-conspirators had siphoned off hundreds of thousands of dollars from Lottery Victim 2, Kurland continued to lie to his client. He recounted to Smookler that in his earlier conversation with Lottery Victim 2, he told Lottery Victim 2 "every money that is coming in is going back to repayment," adding that Lottery Victim 2 "doesn't think anyone is defrauding [him/her]—which you're not, you know."

3.      Lottery Victim 3—"South Carolina"

The co-conspirators' largest and most egregious fraud was perpetrated against Lottery Victim 3, the winner of a $1.5 billion lottery, and the client whom Kurland touted most in marketing his practice. Kurland and his firm charged Lottery Victim 3 an initial $200,000 payment, and $50,000 monthly fees thereafter. As with the other Lottery Victims, however, Lottery Victim 3 did not know that Kurland was siphoning off additional money from his/her winnings. Like Lottery Victim 2, Lottery Victim 3 told Kurland that he/she was only interested in conservative investments, and understood that Kurland's recommendations were in line with that preference. As with the other Lottery Victims, Kurland persuaded Lottery Victim 3 to invest in seemingly independent entities that were, in reality, connected to the defendants. In total, Kurland persuaded Lottery Victim 3 to invest over $60 million in various entities that are tied to the co-conspirators, and Kurland transferred an additional $19.5 million from an account held by Lottery Victim 3 without his/her knowledge, much less authorization. The co-conspirators have lost more than $70 million of Lottery Victim 3's money.[15]

a)      March 6, 2019 Transfers to JBMML ($20 Million) and Cheddar Capital ($10 Million) (Counts Eleven and Twelve)

Following Kurland's advice, on March 6, 2019, Lottery Victim 3 invested $20 million in JBMML and $10 million in Cheddar Capital. Shortly after the $20 million transfer to the JBMML account, JBMML sent, among other wires, $50,000 to American Express, $2,100.50 to Porsche, and a kickback of $200,000 to Kurland. The same day that Kurland collected his kickback, another entity controlled by Smookler and Russo, Unified Commercial Painters, received $1.5 million from JBMML, which in turn sent (after filtering through out other entities) $210,000 to Smookler's personal account. Within a couple of weeks, JBMML also paid thousands of dollars to BMW and the Muttontown Country Club. In the ensuing days, with the money taking its usual route through the defendants' entities, Smookler and Russo spent tens of thousands of dollars on landscaping, another country club called the Mill River Club, and their vehicles. All in all, the co-conspirators took over $1 million from Lottery Victim 3's $20 million JBMML "investment."

Similarly, the same day that Cheddar Capital took the $10 million infusion, Kurland received a $100,000 kickback—resulting in a cumulative $300,000 payday for Kurland

---

[15]      As noted below, the government has, simultaneously with the defendants' arrests, frozen certain accounts and assets connected to the fraud.

just from this one victim, from one day of "investments."   In the coming days, Kurland "cleaned" this money by transferring it to his personal account and splurging on purchases at Saks, Gucci and Old Westbury Golf and Country Club, among other places.

       b)      April 12, 2019 $12.6 Million Transfer to JBMML (Counts Two and Thirteen)

On April 12, 2019, Kurland persuaded Lottery Victim 3 to invest $12.6 million with what he described as a broker and wholesaler of diamonds; again, this appears to have been a reference to Altieri's business.  In an email, Kurland promised Lottery Victim 3 that the investment would "earn $2,000,000 profit."  Kurland timed the transfer to coincide with Lottery Victim 1's transfer of $5 million into the same JBMML account.  As detailed above, the co-conspirators pilfered the funds from both Lottery Victims in the days after, sending hundreds of thousands of dollars to personal accounts, to make car payments for luxury vehicles and for other extravagant expenses.  Smookler and Russo also used the stolen funds to buy themselves a yacht, funneling money from JBMML through other accounts before paying the $451,461 bill for the yacht from Azimut, the "boat management company."  See supra n. 13.

Evidence shows that Kurland, Russo and Smookler learned Altieri was running a Ponzi scheme using his business long before he was arrested.  For instance, in January 2020, according to documents available in Altieri's bankruptcy proceeding, JBMML secured a confession of judgment from Altieri, showing that the defendants were on notice even then about his insolvency.  In March 2020, Russo told Altieri on a recorded call that his "Ponzi scam basically is exhausted, that's what it is.  When a Ponzi scam is exhausted that means you cannot raise money any longer."  And in July 2020, Kurland and Smookler discussed Altieri's business on a recorded call; Kurland estimated that two-thirds of the Lottery Victims' money that had been sent to Altieri had been lost, and that for some of his other clients (who he had also steered towards investments with Altieri), all of their money, according to Kurland, was gone.

Despite knowing this information, Kurland continued to reassure Lottery Victims 1 and 3 through July 2020 that more money was on the way from their investments in that business.  In fact, Kurland told Lottery Victim 3 in July 2020—the same month as his statements to Smookler on the recorded call that two-thirds of the Lottery Victims' funds invested in Altieri's business were gone—that his/her money was safe and accruing an additional $100,000 per month.

c)      April 13, 2020 and April 23, 2020 $19.5 Million Transfers to CC-1
Lawyer's Account and to Azimut (Count Six)

Kurland persuaded Lottery Victim 3 to invest, on April 13, 2020, $19.5 million in a deal that he represented would purportedly help the state of California obtain PPE.  Lottery Victim 3 agreed based on the understanding that all of his/her profit on the investment—which Kurland stated would be $300,000 per month— would go to charity, and the broker on the deal would match this donation and send an additional $300,000 to charity.  That broker was apparently the Genovese soldier, Chierchio.

The co-conspirators were not satisfied, however, with simply getting Lottery Victim 3's $19.5 million investment.  On April 23, 2020, Kurland—who had been given access to Lottery Victim 3's accounts—simply took another $19.5 million from Lottery Victim 3, without telling Lottery Victim 3 or getting his/her authorization, and transferred it to Azimut. Approximately $15.5 million of that money was transferred to Chierchio (at Chrch Group) on the same day; Chierchio, in turn, in addition to spending some of the money on PPE, distributed the funds among other entities and individuals, and cashed out almost $900,000 at a check-cashing business in Staten Island.  He also spent tens of thousands of dollars on, among other things, private jets, jewelry and yacht club fees.  The rest of the stolen $19.5 million, about $4 million, was divided evenly between CC-1's daughter and Russo's and Smookler's Unified Commercial Painters—a first stop on the way to other entities and individuals.  In an ironic twist, Russo and Smookler even used the stolen money they received from Lottery Victim 3 to pay their respective attorneys, hired to defend them in an investigation into the fraud related to the Lottery Victims.

The PPE deal into which Lottery Victim 3 invested almost $40 million—half of which investment he/she did not know about or authorize—did not turn a profit.  In fact, Lottery Victim 3 has not received any money back from the two $19.5 million transfers.  But records show that on June 10, 2020, California paid a total of almost $7.36 million for PPE into an attorney escrow account, and Chierchio's Chrch Group subsequently received $7.25 million of that money.  Chierchio did not donate any of it to charity or pay back Lottery Victim 3, instead spending freely on himself.  Then on June 29, 2020, he wired $1 million to Sirenusa, an entity controlled by Russo and Smookler.[16]

---

[16]      The remaining money from this deal that is still in the Chrch Group account, as well as funds in the co-conspirators' other accounts from this transaction and others, were frozen pursuant to seizure warrants executed earlier today.  The government also placed liens on three houses.

The co-conspirators turned Lottery Victim 3's desire to help others upside down. Not only did no charity receive any money, at some point, the co-conspirators hired a major law firm to threaten California with litigation over their PPE deal while the state was battling the pandemic.   Kurland even wished the COVID-19 outbreak would grow worse in Florida to improve business prospects for an alternate deal, with another state.   As the number of cases and deaths in Florida from COVID-19 continued to rise in July 2020, Kurland opined on a call with Smookler that, "The worse, the worse it is the better."  Smookler agreed: "True."

d)   May 29, 2019 $1 Million Transfer to Back in Black Stables, LLC
(Count Four)

With Kurland's assistance, Lottery Victim 3 also bought five thoroughbred horses and let Kurland (himself a horse aficionado) co-own them.   On May 29, 2019, Lottery Victim 3 transferred $1 million for this purpose into a new entity that unbeknownst to him/her was created by Russo and Smookler, Back in Black Stables, LLC ("Back in Black").   Although Kurland did not invest any of his own money in the venture, Lottery Victim 3 agreed to list him as a 10% owner of the horses, so that Kurland could feel like he was part of the business.   But that act of kindness was not enough for Kurland.   Unbeknownst to Lottery Victim 3, Kurland's co-conspirators had full access to the Back in Black bank account.   Subsequently, JBMML received $400,000 from Back in Black, and the co-conspirators paid tens of thousands of dollars to American Express.   As with their other Ponzi-like scheme noted above, the co-conspirators sent some of the $400,000 back to other accounts associated with Lottery Victim 3, money that Kurland led him/her to believe constituted interest payments from other investments.

A week after the FBI interviewed Lottery Victim 3 Kurland began trying to cover up his co-conspirators' involvement in Back in Black.   On a June 30, 2020 call, Russo informed Smookler that, "You know Jay [Kurland] made us sell the horses yesterday?"  Further underscoring the illicit nature of the transaction, Russo stated that he completed the transfer by signing "three bills of sale to [Kurland] directly for the consideration of $1."  When Smookler asked, "So we don't own horses anymore?"  Russo corrected him, referring to the entity Lottery Victim 3 thought was used solely for the horses, "Well we no longer—Back in Black no longer owns."

By end of July 2020, Back in Black had virtually no money left, and with the FBI investigation becoming more overt, Kurland grew increasingly uncomfortable.  The Assistant notified Russo that Kurland was inquiring why Back in Black (which had been created over a year earlier) only had $8,000 left in its account.   Russo's response confirmed that this account—which Lottery Victim 3 believed was used for his/her horse business—was just another entity from which co-conspirators paid themselves and used in their money laundering scheme.   Russo told the Assistant to remind Kurland that JBMML had taken out $150,000 to "sen[d] to JBMML and put into one of the deals."  Russo even offered a lie Kurland could take to Lottery Victim 3: he "could say that the bills are paid."  When Kurland expressed displeasure about the low amount in the Back in Black account, Russo directed the Assistant to tell him that JBMML would repay some of the money.

16

e)      The Defendants' Conversations About Lottery Victim 3

The fraud against Lottery Victim 3 was so extensive and so blatant that even Smookler predicted that with the FBI having obtained records from Lottery Victim 3 (the "big fish" as he called him/her), "jail" was all but certain for the defendants.  "[T]here is no way we can get this money back," he told Russo.  In another intercepted call, Smookler stated that when the FBI obtains records and sees "the Chrch Group [i.e., the Chierchio entity that received most of the stolen money] and all this, it's not going to look wonderful."

But while Smookler and Russo worried about their exposure stemming from the fraud on Lottery Victim 3, Chierchio had few concerns.  In a July 2020 call, Smookler pleaded with Chierchio, "we have to fucking give that money back to these people," explaining that the "Feds [have] all the documents pertaining to our transactions" and reminding Chierchio that Lottery Victim 3 just "wanted to donate [the money from the PPE deal] to charity."  Smookler stated if they could pay back the money and make "the fucking donations," then when the "Feds circle back, the people say, 'Yeah, I got paid back,' and they are like, 'Aww fuck, there is no case here.'"  Chierchio replied "[t]hat makes no sense at all.  Then we all lose."  He also rejected Smookler's concerns about the FBI:

CHIERCHIO:      It doesn't matter.  This is not an FBI thing.

SMOOKLER:      It is now.

CHIERCHIO:      OK. So bring the FBI.  Who cares?  They've been up my ass my whole life.  It doesn't matter.  I laugh at them.  Ok?  I laugh at them.

SMOOKLER:      All right.  Maybe you have thicker skin.  I hear the FBI--what the--I don't deal with the FBI.

CHIERCHIO:      You're giving them too much credit.

Later in the conversation, Smookler asked Chierchio, "You don't think we are going to get arrested? . . . For taking money from an investor and not paying them back and having this whole cast of characters involved?"  Chierchio, whose phone had been wiretapped before, chastised Smookler for speaking openly: "You're talking stupid, bro."  Chierchio stated that he did not believe they would be arrested and that Kurland would just have to "dance around it and tell his clients it's going to take a little bit more time" to get their money back.  Chierchio also criticized Smookler for drawing attention to themselves by suing the state of California.

Chierchio showed no remorse for stealing money from Lottery Victim 3, as reflected on a May 2020 recorded call:

CHIERCHIO:      Remember, you and I did not hit the lotto for 1.5 billion.

RUSSO:                    Know this, they're the least persons I'm worried
                         about.  I'm worried about your family and my
                         family. . . .

Other examples of incriminating conversations regarding Lottery Victim 3 abound.  For instance, on a May 2020 conference call with Russo and Kurland, Smookler asked Kurland what would happen if the FBI "looked into JBMML, they see South Carolina [Lottery Victim 3] put up 35 million [dollars], there's still debts outstanding, and they go to them and they say, they, we want you to work with us, against Jay, would they?"  Kurland exclaimed, "No!"  Smookler pressed on whether Kurland was confident that Lottery Victim 3 would not cooperate with the authorities, "Would they be like, look, I'm living my life, I don't wanna deal with this shit, leave me alone?"  Kurland responded in the affirmative, "That's basically what they would say."

4.      The Defendants Use Lottery Victims' Money to Fund Lavish Lifestyles

The co-conspirators used the money they had taken from the Lottery Victims to live lavishly.  As noted above, Kurland spent some of the money on luxury vehicles, including a $113,000[17] Porsche and exorbitant shopping sprees.  Smookler and Russo, who appear not to have any employment other than creating entities, moving money among them, and dabbling in "investments," also enjoyed expensive cars:  Russo's collection includes a $132,000 Mercedes Benz G550 SUV and a $52,000 Land Rover Discovery; Smookler has had a number of vehicles recently, including a $146,000 Mercedes Benz S560 convertible, a $128,000 Range Rover, and a $194,000 Bentley Bentayaga.  Smookler, Russo and Kurland all have vanity plates on their cars, with Kurland proudly displaying the name of his entity, GK3, through which he siphoned off his clients' winnings.  Russo and Smookler also had two yachts and Smookler, like Chierchio, has also traveled on private jets.

Chierchio purports to be employed running a plumbing business, but appears to have spent most of his time on fraud-related activity.  As he told one of his assistants on a June 2020 call, "Just shut the fuck up and get us out of this plumbing business already."  After Chierchio took millions of dollars from Lottery Victim 2 and 3 and sent almost $1 million of it to cash out at a Staten Island check-cashing location, he spent freely on yacht club fees, private flights and jewelry.  Chierchio has had a chauffeur who drives him in a $73,000 Cadillac Escalade.  He lives in a luxury building in Manhattan, which is equipped with multiple swimming pools, a staff of attaches for personal errands, a fitness center and a climbing wall.  Chierchio's apartment was last listed for rent at over $11,000 per month.

The intercepted conversations provided just a sample of these lifestyles, effectively supported by the Lottery Victims' winnings.  Smookler and Russo poked fun at Kurland's apparent need not just to buy expensive cars with his clients' money but to "wrap" them, a procedure that can cost well over $10,000.  As Russo expressed to Smookler:  "You know if this ever goes to court, they won't even get mad at the cars, you know what they'll get

---

[17]      These figures represent approximate estimated retail prices of the new vehicles. All the cars listed above are 2018 or newer.

mad it? They'll get mad, hey Jay, you wrapped the car? It wasn't enough for you to get brand new cars? You were wrapping cars? Like they'll go over details. It's crazy. He was drinking the juice just like everybody." Speaking with Chierchio, Smookler noted that Kurland was likely worth $15 to $20 million dollars, adding that when he "buys his race horses, he doesn't claim horses for like 25 grand at Aqueduct, he buys like million dollar yearlings out of Secretariat, he trying to win the derby."

The loss and theft of tens of millions of dollars from the Lottery Victims did not affect the co-conspirators' spending habits. In June 2020—with much of the Lottery Victims' money gone—Russo nonchalantly approved the Assistant's request to wire $27,000 to Smookler from JBMML for a private jet to fly him back to New York after he spent months away in Miami and St. John, where Smookler and Russo own homes together. Notably, as recounted above, JBMML is one of the entities into which the Lottery Victims wired money and which suffered significant losses as a result of Altieri's Ponzi scheme; it is also the entity from which the co-conspirators drew for Kurland's kickbacks and various personal expenses. Chierchio continued to fly privately as well, spending $62,000 in July alone (to go along with $27,900 he spent on two flights in June). In one telling moment of reflection on the money the co-conspirators lost and the fact they were subjects of various investigations, Russo told Kurland that he was ready to scale down his lifestyle, "You know, I don't need the helicopters, you know, maybe I take a private jet once a year to Florida with the family."

     5.    <u>Attempts to Cover Up the Fraud and Liquidate Assets</u>

As already noted, the co-conspirators repeatedly discussed how to cover their tracks and impede any investigation into their conduct. On other calls, they also discussed manipulating evidence. For example, in June 2020, just as the FBI was beginning to interview the Lottery Victims, Smookler and Russo discussed destroying hard drives, before concluding that it was "almost pointless":

| SMOOKLER: | Do you think that we should take all the hard drives out of this office and destroy them? |
|---|---|
| RUSSO: | What's on the hard drives? |
| SMOOKLER: | Hard drive is like every piece of data (UI), cause when they subpoena us they're going to ask for that. |
| RUSSO: | Yeah, I'm not against it. |
| SMOOKLER: | I'm saying just remove them, you know, just take the computers out so there are no computers here. |
| RUSSO: | Yep, well you would have to replace them because you can't make it look obvious. |

| SMOOKLER: | Yeah, we'll take like, you know-- |
|---|---|
| RUSSO: | Just buy three new computers, that's it. |

On later calls, they appear to have concluded that it was better not to destroy their hard drives.

In addition, because they felt the FBI was on their heels, the co-conspirators discussed the urgent need to pay back the money they had taken from the Lottery Victims. This view—that Kurland's clients need to be repaid so that the FBI would stop its investigation—was a common theme throughout the interception period. Smookler repeated it in a June 2020 call with Kurland, saying, "At least if they [Lottery Victim 2] can say they got back their 2.5 [million dollars], it takes one less, you know, the Feds aren't gonna be, like, up our ass." The sentiment was echoed by Russo in a May 2020 call with Chierchio in which Russo stated, "I care just about making sure the next time these people [the Lottery Victims] respond back to the Feds, they respond back that we repaid them and they're very happy." In late June 2020, when Russo and Smookler concluded that the investigators were closing in on Kurland, they agreed that it would be "pointless" to pay the Lottery Victims anything if Kurland was arrested.

When it was clear the FBI was interviewing the Lottery Victims, and with no prospect or desire to fully repay them, the co-conspirators planned how to make excuses about the theft and mismanagement of the Lottery Victims' funds. Notably, Kurland, who the Lottery Victims believed was not affiliated with any of the investment entities, was heavily involved in drafting a statement from those entities, which Kurland planned to pass along to the Lottery Victims. On a June 22, 2020 call with Russo, Kurland had the following suggestions about how Kurland needed the entities' lawyer ("Attorney 2"),[18] to be "creative" in his letter to Kurland's own clients:

| KURLAND: | This is what I called you about, I need from [Attorney 2], well, he--he has to be like creative about it, but I think a letter from JBMML to the investors, letting them know, say like, "I'm the attorney for JBMML," um, you know, something about corona, and thank you for being so patient, and we're going to work very hard (UI) something in the future, you know, um— |
|---|---|
| RUSSO: | We have not abandoned ship, we are still trying— |
| KURLAND: | My clients, yea, my clients are doing everything they can to get this back, "I appreciate your patience, once some of these avenues come back," because I told them (UI), I said there was a big |

---

[18]     Russo and Smookler have relied on Attorney 2 for representation in the Altieri bankruptcy proceeding and in connection with certain criminal actions, including providing false information to a bank.

receivable that they're hoping to get back, but that could be in court (UI) I said there's a uh another tranche that (UI) hedge fund came in and now we're fighting with them to get money and we just don't have enough money coming in, but nobody is going to abandon ship, like I told them the truth--

\* \* \*

KURLAND:   I would do, a you know, Healthy Rainbow and the (UI) it doesn't have to be the same kind of letter, but I would do it to them, and then for the other ones, you know, I would say also with the jewelry stuff, you know, just make it like personal, like, you know, we understand (UI) but we're going to make it up to you and we'll come up with a plan, you know something like that.

Weeks later, in mid-July, Kurland discussed this letter again, asking the co-conspirators to put a positive spin on the situation, despite the loss of so much of the Lottery Victims' money:

KURLAND:   . . . You don't need so much detail, like, they don't need every little index number, for this and that, you know, I would think it's more listen this is what happened, this guy was arrested it was a Ponzi scheme, it was a big chunk, you know make it a little more positive, we're gonna do the best we can, you know, this, there's gonna be a recuperation, in the meantime we're probably

RUSSO:   I said, I said the same exact thing, he doesn't have to harp on the negatives, this happened, we have good intentions, we have plans, and, and, keep it light and airy and positive.

Although Russo and Smookler were unwilling to fully repay the Lottery Victims, they openly discussed their need to stash money for themselves if the FBI investigation progressed further, and to complicate any tracing analysis that the FBI would perform.  On June 24, 2020, Smookler stated that, "We could start liquidating shit but then where do we, where do we put it?"  Russo responded, "It's better to liquidate it and move it around, so, trust me," a statement with which Smookler agreed.  Russo added, "Set up a new company, have the wives set up a company and just put the assets in there, do something, it's much better to do anything else."  Also in late June call, Smookler and Russo agreed that, "We are doing nice liquidation, it's beautiful, I'm not worried," concluding that they were progressing towards their goal of "accumulating cash now."

There are numerous additional examples of these types of communications, including the following:  (1) Russo explained to Smookler how to keep certain payments "under the layers" by using an American Express card, so that they do not "stick[] out" and "raise[] the flag"; (2) plans to "steer" money into accounts that were outside the "scope of [the] magnifying glass" of investigators; (3) plans to put money in a "clean" corporation (called Southbound), which they thought would not be looked at by the FBI; (4) a late June discussion about the need to transfer money "into our personal corps as soon as possible.  Movement, movement, movement, movement."; (5) a discussion about selling a house in which they agreed that it is "sad to see that gem of a property go, but we need it to get traction, we needed to make it get lost in transactions."

C.     The Scheme by Defendants Smookler and Russo to Extort Altieri (Counts Eighteen through Twenty-One)

Separate from the charges related to the Lottery Victims, Smookler and Russo have also been indicted for extortionate extension and collection of credit (and conspiracy to commit those crimes), which they also carried out earlier this year.[19]  In recorded conversations, Smookler and Russo threatened Altieri after extending him a "street loan" of approximately $250,000 under usurious terms.  This loan was separate from the investments the co-conspirators made in Altieri's Ponzi scheme with the Lottery Victims' money.  As Smookler explained in one call to Altieri, the repayment of the "$100 million you owe" (i.e., the millions of dollars of the Lottery Victims' money, plus the profit the co-conspirators apparently thought they should receive) could be delayed and put on a "shelf," but the "couple of hundred grand that you borrowed, you have to pay that back."  The threats were violent and explicit:  among other things, Smookler and Russo vowed to shoot and kill Altieri and his family.  As noted below, during the execution of search warrants earlier today, the arrest teams recovered shotguns from Russo's and Smookler's residences, including the tactical shotgun Russo can be heard describing in detail to Altieri when he threatened him.

On the recorded calls, Smookler and Russo told Altieri that they had borrowed $250,000 from "animals" to extend Altieri the loan.  Intercepted conversations between Russo and Smookler made clear that the originator of the loan expected $325,000 back.  But the $325,000 sum did not include Smookler's and Russo's "fees."  In a call between Altieri and Smookler, the two men discussed $115,000 Altieri had already repaid on the loan, but agreed Altieri still owed about $300,000.  This meant that Smookler and Russo had extended Altieri a loan of $250,000 and expected to be repaid about $415,000.  Smookler said the originators of the loan were the sort who had to repaid in a timely manner because they were "really crazy people," and that Altieri had to make payments, even if it meant he had to "rob a bank, or just do

---

[19]     There are recorded calls that indicate Kurland was aware that Russo and Smookler tried to forcefully collect their debt from Altieri.  For example, in a July 2020 call, Smookler told Kurland that Altieri "could say that they threatened me for the money, ok, we did, the guy owed us $50 million, of course we threatened him."  Later in that call, Kurland warned Smookler that the FBI has probably "seen every text you have ever sent to [Altieri]," which Smookler stated was ok because all he was trying to do was "collect our money."

whatever you have to do." As Smookler put it, the people Altieri had to pay were "not lawyers, they're not businessmen, they're just animals."

To collect the debt on this usurious loan, Smookler and Russo threatened Altieri and his family. For instance, in March 2020, Russo told Altieri that he had just purchased a "few tactical shotguns" with "lasers . . . not that you need a laser on a shotgun." Russo made these statements to reinforce Smookler's threat that if Altieri did not pay at least $10,000 within four to five days, "it's just going to be unbelievable," offering Russo a "lot of ammunition" if he needed it for the shotguns.

Russo reminded Altieri about his father's death in prison while he was serving a sentence for murder.[20] Russo even compared himself to the mob-affiliated character in "Uncut Gems," a movie that ends with the indebted diamond dealer shot dead. In another call, in which Smookler was also on the line, Russo told Altieri, "They're gonna pop your head off in front of your fucking kids. This guy has no clue what he's getting into." Smookler, for his part, told Altieri that "You can't take our money and tell us you are doing one thing and then do another. You can't do that . . . . You watch my man, you fucked me, now watch what I am gonna do to you, I'm coming brother. Full fucking steam ahead." Smookler also told Altieri, "I hope your lawyer dies in a car accident tonight. You understand? I hope your lawyer dies in a car accident. Him and his whole fucking family."

Smookler also informed Altieri that people "in the street" were going to inflict harm upon Altieri for the "suffering" he caused Smookler:

> I don't give a fuck about a virus I don't care about people dying. I don't care. I want my money. And you can't pay it so now what happens in the street when you can't pay? They just crush you out of just to say okay we feel a little bit better now and this guy is in a fucking box. Because the money's gone. So who cares, that's been done. Now it's just the internal satisfaction of you suffering the way you made us suffer. No more or no less.

The co-conspirators threatened Altieri's family as well. For example, on March 31, 2020, Smookler told Altieri that his wife would "pay for your mistakes." When Altieri pleaded to leave his wife out of it, noting that she just had a tragic passing in her family, Smookler responded, "I don't give a fuck. I don't care," later adding that, "You're gonna get fucking tortured." In the same call, Smookler told Altieri that, "[W]e are gonna find your wife today. That's happening." Smookler and Russo knew that Altieri had gotten hit in the face with a wrench by one of his other creditors, and promised to do the same to him.

---

[20]     Russo's father was Joseph "JoJo" Russo, a Colombo crime family captain who died in federal prison serving a life sentence for racketeering and murder offenses. See 92-CR-351 (E.D.N.Y.).

The threats continued through May 2020 even though, as the calls made clear, Altieri had already paid $115,000 of the $250,000 loan.[21]  In a May 5, 2020 call, Smookler told Altieri that he was not "going to go away" and warned Altieri that he was "not playing the game with the banks and the fucking lawyers and shit."  Altieri, Smookler said, "got big problems coming down the pipe," and Smookler would "turn ungentlemanly."  He promised to "fuck up" Altieri's "family," warning him, "You can call the police.  You can call the FBI."  The following day, Russo told Altieri that the threat to his family was imminent, and that if he loved his daughter, son and wife, then Altieri should go to the police and "get them out of that house"— but pay Russo back "ASAP."  Russo claimed that "they" were coming for Altieri's family, and that "if this is being recorded, I don't want any part of this."  When Altieri pressed on what would happen to his family, Russo said, "They're going to make you watch as they rip your son's teeth out of his mouth, watch, they're going to do worse things to your wife."  When Altieri confronted Smookler about this threat, Smookler asked, "are you going down in a blaze of glory?"

## II.   Legal Standard

The Bail Reform Act ("BRA") directs courts to order a defendant detained pending trial if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).   While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).  The government is entitled to "proceed by proffer" in arguing for a defendant's detention.  See Ferranti, 66 F.3d at 542.

In reviewing bail determination, the Second Circuit has repeatedly focused on the safety of witnesses.  See, e.g., United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000) (affirming finding of dangerousness based on witness tampering in a white collar case with no allegations of violence or threats aimed at witnesses); United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (reversing district court's rejection of dangerousness because no specific witness had been identified as the object of potential influence or intimidation, because no "such . . . identification is required," where there was evidence that the defendant "threatened to harm any witnesses that might testify against them"); see also United States v. Gotti, 02-CR-743 (RCC), 2004 U.S. Dist. LEXIS 3308, at *12-13 (S.D.N.Y. Mar. 2, 2004) ("[A] threat to witnesses in this case and to the integrity of the trial process weighs in favor of pretrial detention.  This threat is especially grave here because the Government proffers that Defendant knows the identity of many of the Government's witnesses."); United States v. Grisanti, No. 91-229A, 1992 WL 265932, at *7 (W.D.N.Y. Apr. 14, 1992) (finding the defendant too dangerous to be released because he lied to the court and because even if his physical movement can be restricted, contact with potential witnesses cannot be); United States v. Rivera, 09-CR-619 (SJF), 2010 U.S. Dist. LEXIS 39641, at *6-8 (E.D.N.Y. Apr. 21, 2010) (affirming Judge Orenstein's order of detention

---

[21]     During recorded meetings that the FBI was able to surveil, Russo continued to threaten Altieri, even as Altieri delivered $5,000.

in part because the defendant knew where the victims lived and the defendant was capable of attempting to intimidate witnesses).

III.   Discussion

There is overwhelming evidence against all four defendants—irrefutable proof based in large part on bank records and the defendants' own admissions on recorded calls. The strength of the evidence and prospect of significant prison terms make all of the defendants a flight risk, and the fact that they have significant means to do so means that any bond must include strict terms of supervision and be secured by property. Russo and Smookler also present a danger to the community, including to the witnesses in this case, and for that reason they should be detained.

A.   Weight of the Evidence

1.   Evidence of the Fraud Scheme

The Lottery Victims' statements and bank records are, standing alone, sufficient to convict all four defendants, because they show, among other things, that (1) Kurland persuaded the Lottery Victims to make the investments without disclosing his affiliation with the businesses or the kickbacks he would receive, (2) the defendants stole some of that money, and (3) the defendants mismanaged the rest of the money they did not steal, not only by failing to disclose the losses to the victims but, in some cases, funneling stolen funds back to the Lottery Victims and falsely claiming those funds constituted "interest payments" on the failed investments to further conceal the scheme. Indeed, as recounted above in detail, all four defendants pocketed money from the Lottery Victims almost immediately after the investments were made, and used them for personal expenses. In the case of Lottery Victim 3, the defendants simply stole almost $20 million. And when the co-conspirators received over $1.7 million from the NYPD and over $7 million from California, they still did not return those funds to the Lottery Victims as promised—though they later contemplated doing so for the sole purpose of stopping the FBI investigation.

As the quoted communications throughout this letter make clear, the intercepted conversations among the co-conspirators will provide damning and indisputable proof at trial. There are dozens of other examples, not previewed above, of similarly incriminating conversations. For example, on a May 2020 call, Russo reaffirmed the sentiment clearly shared by all the co-conspirators: "Nobody gives a fuck about a billionaire or hurting them or what not, but we have access to capital. . . . [W]e could pull hundreds of millions of dollars . . . ." In late July 2020, when Russo observed that the "funniest part" of their predicament was when another person "finds out that we lost $100 million," and "we only raised money from a lottery winner." Smookler and Russo have explicitly admitted to "scrap[ing] things off the top" from the Lottery Victims' investments. It would not look good, Smookler expressed in another call, when investigators "come to me saying, 'Look, you guys made all this money, you guys are buying high end cars, meanwhile, these people lost all this.' 'Yeah, we are living high on the hog when we are working.'"

In some calls, Smookler and Russo even predicted the charges they would face. Russo remarked in the end of June 2020, "I would say 100% wire fraud." Soon after the FBI began interviewing the Lottery Victims, Smookler anticipated that he and Russo were likely headed for jail. One conversation included the following exchange, in which Russo tried to convince Smookler (and perhaps himself) that they would be spared because they were just accepting money that Kurland was offering, as if the temptation of free money is a viable defense for fraud:

| SMOOKLER: | I feel like we're going to jail. Like, I believe that. |
|---|---|
| RUSSO: | I don't believe that. I think Jay [Kurland], I think Jay should get a second lawyer on top of his first lawyer and start to put a team together because even when you speak to non-legal people they all say how immoral, doesn't understand it, and that alone will get something to stick. |
| SMOOKLER; | Yeah. |
| RUSSO: | And I feel like we have a true layer of separation, we really do. Show me one person, in our position, who wouldn't accept the monies coming in. |
| SMOOKLER: | I know brother, I just feel like if they fucking get him, they're getting us. |

Smookler concluded in the conversation that, "I'm fucking telling you, we are going to jail, I know it." When Russo expressed the hope that perhaps they would just be fined $1 million, Smookler responded, "I would sign up for that right now" because "we are in a little bit of a pickle." In other calls, Smookler expressed the expectation that they will be arrested "for taking money from an investor and not paying them back." Chierchio did not share this view. He thought the co-conspirators were giving the FBI "too much credit," and that Kurland should just continue "danc[ing] around for his clients" by giving them excuses about the delay in payments.

When not previewing bogus defenses or predicting their arrests, Russo and Smookler also discussed why the Lottery Victims—who have largely stayed anonymous—would not want to sue them. Russo observed in late May 2020 that, "Jay's guys [i.e., the Lottery Victims] can never sue us, never do anything because they are anonymous," to which Smookler responded, "I know." This exchange confirmed their knowledge that one of Kurland's selling points to the Lottery Victims was his assistance in keeping them anonymous, a fact which the co-conspirators now thought would protect them, as the Lottery Victims would likely not want to be named plaintiffs in civil lawsuits to recover their stolen funds.

In other calls, Russo and Smookler tried to convince themselves that they were not criminals, but in doing so only further revealed their crimes. As Russo put it in one call, "We may not be the cleanest bookkeepers, and we may uh have uh not run the tightest ship, but we

didn't do anything illegal."  Smookler discussed their exposure with CC-1 in even more candid terms:

| | |
|---|---|
| CC-1: | Yeah, yeah. I guess that's the, uh, I guess the thought process is fuck Jason, fuck the billionaires, they're billionaires, fuck them, they  don't need the money. |
| SMOOKLER: | Yeah. But I don't think that the Feds will look at it like that. |
| CC-1: | I don't know, I don't know how it plays out. You think people care about lottery winners losing twenty— |
| SMOOKLER: | Yeah, yup.  I think they paint them as naive victims, they paint Jason as the mastermind lawyer, and they paint us as the behind the scenes guy. Yeah, I do. |
| CC-1: | Mmhmm. |
| SMOOKLER: | You got gangsters involved, you got famous lawyers involved, you got billionaires, you got the lottery, you got a case there. |
| CC-1: | Mmhmm. |

As worried as Smookler and Russo were about their own liability, they believed that Chierchio and Kurland were in even worse positions.  As to Chierchio, the two co-conspirators concluded in a June 2020 call that, unlike them, he simply "skimmed $4 million off the top" and as a result he was "more liable."  They repeated in another call that Chierchio "knows he can get in trouble for skimming off the top."

Smookler and Russo also discussed Kurland's exposure at length.  In a late May 2020 conversation, Smookler and Russo agreed that Kurland was the "greediest guy in the room," that he "closes all these deals" because it is "simple greed."  Russo concluded that "It's corruption at its finest . . . .  And he took it from clients he knows can't go after him.  He took it from anonymous clients, the Staten Island and the Rainbow will be a slight issue but South Carolina ain't never putting up a stink on nothing because Jay's exposure is probably really 12 to 15 million the most, that's it, not even."  Months later, Smookler and Russo agreed that Kurland is "fucked," with Russo explaining that "morality is against him," and that "[h]e did it to himself, he knows it. . . ."  In a call with CC-1, Smookler opined that Kurland "won't be happy until he's in jail.  He's gotta see the inside of a cell," a sentiment repeated in another call with CC-1, during which Smookler said that the most likely situation is that Kurland is "gonna end up on the front

of a newspaper with, you know, hung himself in his garage or something because I can't see how he gets out of this."

        Russo accurately stated the law when he observed that even repaying the Lottery Victims would not absolve Kurland because of the fraudulent pretenses under which Kurland extracted those investments: "Jay is in trouble, even if Jay gets all the money back it's still not gonna make the FCC [i.e., the SEC] and the feds go away you know that it's like if you robbed the bank and returned the money you still robbed the bank." The next day, Russo told Smookler that "the only thing he [Kurland] can do is put his hands in the air and plead guilty." Kurland also realized his exposure. On a late June 2020 call with Smookler, he agreed with Smookler that even if the Lottery Victims were not concerned with the co-conspirators' malfeasance, "it matters to the government. . . . The government's not going to just be like 'oh, okay. They don't care, so we don't care.'"

        Incredibly, an FBI investigation and the loss of his clients' money did little to dissuade Kurland from contemplating taking more money from his clients and sending it to the co-conspirators. For instance, on a May 2020 call, Smookler told Chierchio that if they returned at least some money to Kurland, "the spigot [i.e., the Lottery Victims] will open again, and again." In another call, Smookler told Russo that Kurland might still give them more money to invest, causing Russo to remark that, "He's always there, that's why I told you all's we got to do is show him a little green or give him a little positivity and he's ripe for the pickings too." In another call, even Smookler could not believe that Kurland was still willing to continue taking money from his clients:

| | |
|---|---|
| RUSSO: | And I spoke to Jay, he's going to get us to use a 2-5 again. I said, Jay, so don't worry. |
| SMOOKLER: | He's gonna get us in jail! I love you. We're going  to go to jail! . . . I'd rather be a dead man. And--you know. I can't . This guy's going to get us put in jail. Unless he - dude, the Feds are all over us. |

        Kurland echoed concerns about exposure, not only admitting in multiple intercepted conversations to making car payments with his clients' money, but also acknowledging, at times, that presenting investment opportunities to the Lottery Victims without disclosing his affiliation with those opportunities could result in his disbarment. For example, in late June, he noted to Smookler that, "The one thing I did tell my clients is, I am not a member of any these entities [involved in the PPE deals]." And in another call, in end of May, he reminded Smookler that they all took the Lottery Victims' money and spent it on personal expenses:

| | |
|---|---|
| SMOOKLER: | Right so what happens, like what like what's the worst thing that could happen? |
| KURLAND: | The worst thing that could happen is they, they get the statements, they get all our— and then |

|   | they just fricken, I don't know, I guess – it's, the worst is the worst. |
|---|---|
| SMOOKLER: | What—what— |
| KURLAND: | You know, the worst is that they say that um money was raised and it was given to Greg [Altieri]. That wasn't what everybody knew, I had no idea that we took - you paid yourselves, you bought cars, you used money for stuff. |

The incriminating exchange continued later:

| KURLAND: | They [the Lottery Victims] would all fire me, for sure. And then they would hire an attorney. |
|---|---|
| SMOOKLER: | But that's like me being your stockbroker and you saying— |
| KURLAND: | Yeah but I'm not a stockbroker. I'm not - this is not what I'm supposed to be doing. I'm you know - you know, I am telling you, there would - I would - It would be a complete disaster. And God knows what would happen to my license, like it's a disaster. We gotta pay these people back. |

2.    Evidence of the Extortion Scheme

As recounted above, Smookler's and Russo's extortionate threats were as explicit and menacing as such threats get. In the recorded communications, the co-conspirators narrate how Altieri owes them $250,000 from a street loan, separating it from the Lottery Victims' money. They used extortionate means in an attempt to collect that loan. Even without the benefit of a presumption for the usurious rate—from which extortionate extension can be inferred, see 18 U.S.C. § 892(c)—the government could meet its burden by simply playing the recordings, though there is other evidence to demonstrate the co-conspirators' guilt. For example, the government will introduce evidence of FBI's surveillance of Altieri's payments, of Smookler's and Russo's access to firearms with which they threatened Altieri and his family, and of intercepted communications in which Smookler and Russo further describe the terms of the loan. The government will also rely on intercepted communications where, for example, Smookler admitted that Altieri "could say they [i.e., Smookler and Russo] threatened me for the money, okay, we did."

B.    All Four Defendants Pose a Significant Flight Risk

There are at least three reasons why the Court should detain the defendants, particularly Smookler, based on flight risk alone.

*First,* all four defendants face significant terms of incarceration for offenses that are charged based on overwhelming proof.  See, e.g., United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order, citing United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007)) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.").  Specifically, they face maximum sentences of 20 years on each count charged in the fraud scheme, and Russo and Smookler face additional maximum sentences of 20 years on each count charged in the extortion scheme, which could result in a sentence of up to 40 years if punishment for their participation in the two schemes is run consecutively.  In addition, a preliminary calculation of the Guidelines for the wire fraud charges alone, based *solely* on a loss amount of more than $80 million, would result in the defendants facing an adjusted offense level of 31.  See U.S.S.G. §§ 2B1.1(a)(2), 2B1.1(b)(1)(L).[22]  That, in turn, produces a Guidelines range of 108 to 135 months, assuming all of the defendants are in Criminal History Category I.  But all four defendants' Guidelines ranges will likely ultimately be much higher, as the defendants currently face multiple serious charges, and the government may supersede with additional charges.

*Second,* even without knowing their significant exposure, both Russo and Smookler, as noted above, openly discussed obstructing justice by destroying evidence and liquidating assets.  With the prospect of federal prison, their desire to tamper with evidence may become even more irresistible.

*Third,* Smookler, Russo and Chierchio have had access either to private jets or boats, or both, which, coupled with their incentives to abscond, make them significant flight risks.  See United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) (affirming detention based on flight risk alone, based in large part on the white-collar charges against him and the incentive and means to flee).  Even more concerning, the three defendants can fly privately on a moments' notice without triggering alerts, and Smookler and Russo have also had access to boats.

Smookler poses the greatest flight risk of the four defendants.  He has had the most extensive travel history in the last two years, having traveled over a dozen times to and from St. Thomas and the Virgin Islands—places from which permanent flight is much easier.  He has also openly discussed traveling abroad in the future.  In a late-July 2020 call, for example, after telling a business associate that he was better off putting money under a mattress than in one of Smookler's entities, Smookler asked, "Where are we going?  Switzerland?"  And he has repeatedly stated in calls that he would do anything to avoid prison, proclaiming, for instance, "I'd rather be a dead man."

In short, all the defendants present significant flight risks, and Smookler's statements and travel history place him in the category of defendants who are the most likely to abscond.  This Court is well aware that the risk of flight is real, even for defendants of lesser means and fewer incentives than these defendants.  See, e.g., United States v. Viomari Lopez,

---

[22]     Additional enhancements for the wire fraud charges are likely to apply as well.  For example, the special skill/abuse of trust enhancement will apply to Kurland, who used his role as the Lottery Victims' attorney to defraud them.  See U.S.S.G. § 3B1.3.

14-CR-626 (LB) (BMC) (Judge Cogan issuing bench warrant for defendant shortly after she was released on bond on the government's consent, even though she was facing only months in prison).

C.      Smookler and Russo Present a Danger to the Community

        Russo and Smookler present a danger to the community.[23]  As with Smookler's enhanced risk of flight, Russo presents the greater danger.

        *First,* they have threatened to shoot and kill Altieri and his family.  Among other threats—some of which are quoted above—they claimed that Altieri would be shot in front of his family, that his wife was in danger, and that his children would be tortured.  Smookler and Russo both have access to firearms, with Russo possessing "tactical" weapons of which he appears particularly proud as reflected even in call not related to Altieri.  He told one person in June 2020, for example, "I have a tactical shotgun, if anything gets crazy with you guys just come straight here, I have all the lights on, I will tactically shoot everybody's kneecaps off, I'm not worried."  When the person asked, "You have something to shoot?"  Russo responded that he did, "I have a very rare laser sight on a shotgun which is hard to find . . . a tactical shogun which is very scary to look at, and it can hold 13 actual shells in it."  These threats are especially troubling after the FBI's recovery earlier this morning of the weapon (photographed below) with which Russo threatened Altieri over the phone, a tactical shotgun with laser sight:



The FBI team also recovered a shotgun in Smookler's house.

        *Second,* in Russo's case, Altieri was not the only target of his threats.  In more recent intercepted conversations stemming from a business dispute, Russo could be heard explicitly threatening another man, again referring to using his firearms.  He promised to his mother to give the person a "beating like he has never seen before," and told the man directly, "I'm coming straight for your fucking middle of your eyes, watch what I do to you, you scumbag."

---

[23]      Chierchio's release also poses a danger to the community if his bond is not properly secured.  Even though he is not charged in this case with any violent offenses, he is a soldier in the Genovese crime family, an organization to which this Court needs no introduction.  Significant restrictions should be placed on him, along with meaningful incentives for him to comply with those restrictions.

*Third,* Russo and Smookler have openly flaunted their disregard of law enforcement, stating repeatedly that they would carry out their threats no matter the consequences.  They repeatedly told Altieri, as they were extorting him, that they did not care about law enforcement's involvement, and invited him to call his friends, who they knew were retired police officers.  On the phone with Altieri and Smookler in March 2020, Russo said he did not "give a fuck about the law" and that "before the law can even arrest me, I'll have everyone with a fucking bullet in the head."  Russo emphasized that he was indifferent if anyone was recording him and he would simply "murder[]" Altieri's "entire family."  He continued, as Smookler listened, "I'll make you look at everyone that I fucking kill. . . . I will fucking plow through every one of your fucking people."  Russo implied that he would not allow law enforcement to arrest him: "My father said that a death sentence was an easier sentence than life.  I will make sure that I have a death sentence for myself.  I promise you."  Russo invited Altieri to tell anyone he wished "how crazy it's going to get, and you see if anybody wants to fuck with it," suggesting that no one would want to take on Russo and Smookler.  Smookler told Altieri in another call that, "I swear you could call whoever you want, call the cops."  Even when Altieri was in bankruptcy, and Smookler learned it was unlawful to collect any money from him, he announced to another person that he would still "turn up the heat on [Altieri] extensively. . . . 'I don't really care about your lawyers and your bankruptcy and this and that, the police, or whatever you're going to say.  I really don't care.  I will spend the rest of my life stalking you all day, every day.'"

*Fourth*, similar to their discussions about destroying evidence, Russo and Smookler have discussed how to dissuade the Lottery Victims from cooperating with the FBI.  As quoted above, Smookler, Russo and Kurland openly wished that the Lottery Victims would just tell the FBI to leave them alone, so that the FBI could not continue its investigation.  The defendants' focus will now shift from the FBI's investigation to the government's prosecution, upping the stakes for them and increasing their incentives to encourage witnesses not to come forward.

No condition or combination of conditions of release imposed on Russo and Smookler—no matter how extensive or creative—could adequately protect the community, including the witnesses in this case.  As the Second Circuit has explained, "home detention and electronic monitoring" is an imperfect attempt to "replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to word of [the defendant] that [he] will be obey the conditions." Millan, 4 F.3d at 1049 (citation and internal quotation marks omitted).  This admonition applies with particular force to individuals like Smookler and Russo, who are not only dangerous but are also sufficiently wealthy to propose the types of restrictions that would approach a private jail.  The Second Circuit has recently cautioned against allowing a two-tiered system in which only poor defendants are remanded.  See Boustani, 932 F.3d at 82  (holding that the BRA "does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails").

To give the Court a concrete recent example of how home detention and electronic monitoring can fail, consider United States v. Yusufov, 16-CR-553 (BMC).  The duty

magistrate judge disagreed with the government that Renat Yusufov, a long-time cocaine dealer from whom we seized a firearm, posed a danger to the community, including that he would resume his cocaine business, and released him on home detention.  See ECF No. 14. Immediately thereafter, Yusufov resumed selling significant quantities of cocaine, relying more on cell phones and his couriers, until the government re-arrested him for other charges.[24]

        Smookler and Russo are worse candidates for release than Yusufov.  They do not need to leave their homes to commit crimes and threaten witnesses; they just need cell phones and a computer, access to which no one can fully monitor.  They have a wider network of associates and the means to easily subvert supervision.  They can contact more co-conspirators who remain at large, with whom they can collude and issue instructions to destroy evidence. They pose much greater risk of flight.  And unlike Yusufov, they have issued explicit threats to a victim and his family, specifically referencing firearms.[25]

        The Court should not take a chance on these two defendants and place the public at risk, even if they are able to propose significant bail packages.

---

[24]     After his arrest, Yusufov was permanently detained.  He cooperated with the government, revealing that he took no break in committing crimes after this Court's release. Yusufov testified at trial and was recently sentenced.

[25]     There are many examples of defendants violating the terms of their bail conditions.  Judge Tiscione, for instance, presided over the bail revocation of John Scarpa, Esq., a white-collar defendant who presented none of the dangers posed by Russo and Smookler.  See United States v. Scarpa, 18-CR-123 (CBA).  Just weeks after securing his release by a substantial bond, Scarpa tried to intimidate a victim of domestic assault by "advising" her to plead the Fifth Amendment when she testified against his client.  While Scarpa's violation was serious, the risks posed by Russo and Smookler, particularly to witnesses in this case, are much greater.

IV.     <u>Conclusion</u>

For the reasons above, the Court should enter permanent orders of detention against Russo and Smookler.  Chierchio and Kurland should be detained as well, unless they present significant bail packages that are fully vetted by the government.

Respectfully submitted,

SETH D. DᴜCHARME
Acting United States Attorney

By:     _____/s/_____
Andrey Spektor
Lindsay K. Gerdes
Assistant U.S. Attorneys
(718) 254-6475/6155

cc:  Defense Counsel of record (by ECF)
       Clerk of the Court (NGG) (by ECF)